UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| JON A GOLDMAN, | ) | |
| | ) | Case No. 13-36045 |
| Debtor. | ) | |
| | ) | Adversary No: 13-1431 |
| _____ | ) | |
| | ) | |
| Robert J. Siragusa, individually and | ) | |
| as trustee for the Robert J. Siragusa, | ) | Honorable Deborah L. Thorne |
| MD Employee Benefit Trust, (formerly | ) | |
| Dermatology Associates of Bay | ) | |
| County, P.A., Defined Benefit Trust); | ) | |
| Dana Siragusa, and Robert Joseph Siragusa, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Jon A. Goldman, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum Opinion**

This matter comes to be heard on the Siragusas'[1] Third Amended Complaint to Determine Dischargeability of claims under 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6) against Jon A. Goldman. The claims are based on loans made by the Siragusas to various limited liability companies owned by Goldman and his business partner Arturo Collazo, which converted apartments to condominiums. The Siragusas claim that the amounts owed on the unpaid loans are not dischargeable and that Goldman is personally liable because the "corporate veil" should be pierced.

The findings of fact are based upon several days of testimony, the post-trial findings of fact and conclusions of law, stipulations to certain trial exhibits, and a stipulation that all parties would

---

[1] The Siragusas are Robert J. Siragusa, individually and as trustee for the Robert J. Siragusa MD Employee Benefit Trust, Dana Siragusa, and Robert Joseph Siragusa.

be bound by the findings of fact in the adversary proceeding against Arturo Collazo conducted before Judge Eugene Wedoff, which are memorialized in *In re Collazo,* No. 12B44342, 2014 WL 866075 at *1-6 (Bankr. N.D. Ill. Mar. 5, 2014).

After reviewing the stipulations, the evidence presented to this court, the arguments of the parties, and the post-trial pleadings, the court finds that the claims against Goldman held by Dana and Robert Joseph Siragusa for funds loaned on the Arizona project are nondischargeable.[2]  The remaining amounts claimed to be nondischargeable by Dr. Siragusa and his pension plan are discharged.

## **Background**

Arturo Collazo and Jon Goldman were 50/50 members of several limited liability companies that purchased apartment buildings to convert them to condominiums.  Collazo acted as the salesman for each project while Goldman handled the legal and financial interactions, meeting with their lawyer, and providing documents, including the promissory notes for each project.

Julie Siragusa, Dr. Siragusa's daughter, is a real estate broker and marketed certain of the Goldman/Collazo condominium units after renovation.  She introduced her father to Collazo, and in 2002, Dr. Siragusa expressed interest in investing in some of the projects.  Following initial conversations with Collazo, Dr. Siragusa invested in the projects listed in the chart below and received promissory notes reflecting investments designed to provide liquidity beyond the conventional construction loans.  Each Siragusa loan was unsecured, and the notes provided for approximately 20% interest and a maturity date within 18 months.  Dr. Siragusa and his pension

---

[2] The parties settled certain claims during a mediation conducted by the Seventh Circuit Court of Appeals.  This court is unaware of the nature of the settlement.  To the extent that Dana received payment in that settlement, that amount should be deducted from any judgment entered in this adversary proceeding.  The court will continue the adversary for status so that this amount may be properly determined.

fund loaned money to the various projects after receiving assurance that both would be repaid from the revenue of the sale of the individual units in each project (but after repayment of the construction loans).  The following chart lists the amounts loaned for several of the early projects.

| Project | Lender | Amount | Date | Maturity Date | Amount Repaid |
|---|---|---|---|---|---|
| 1210 West Waveland LLC | Dr. Siragusa | $100,000 | 9/10/2002 | | Paid in full |
| | Siragusa Pension Plan | $200,000 | | | Paid in full |
| 2801 Seminary LLC | Dr. Siragusa | $60,000 | 9/26/2002 | March 2004 | Partially repaid |
| | Siragusa Pension Plan | $140,000 | | | Partially repaid |
| 643 Barry LLC | Dr. Siragusa | $50,000 | 6/2/2003 | March 2004 | No repayment |
| | Siragusa Pension Plan | $145,000 | | | No repayment |
| 1300 Eddy LLC | Dana Siragusa | $20,000 | 11/12/2003 | February 2005 | No repayment |
| | Dr. Siragusa | $50,000 | | | No repayment |
| | Siragusa Pension Plan | $65,000 | | | No repayment |

Despite the obligations and promises made by Collazo and Goldman to repay Dr. Siragusa and his pension plan as the individual units were sold in each project, repayment was not forthcoming.  Rather than repaying each note from the converted condominium sales in 2003 as promised, Collazo and Goldman began transferring unsold units from the borrower-LLCs to other LLCs they owned.  The pair used the transferred units as collateral for new notes and mortgages. For example, on December 4, 2003, 1210 West Waveland LLC transferred title of three unsold units in the Waveland property by quitclaim deed to an entity called Art-Man Investments LLC (Art-Man), whose sole members were Collazo and Goldman.  At the same time, Art-Man borrowed funds from Private Bank and granted a mortgage lien on those units to Private Bank, the construction lender on the Waveland development.

3

Similarly, on April 19, 2004, 643 Barry LLC transferred three unsold units to Art-Man. Several months later Art-Man granted a subordinated mortgage lien on the three units to Rainbo Asset Management Fund (Rainbo), another Goldman/Collazo-owned entity, to secure an $800,000 note issued by 548 Deming LLC.  Later, on September 24, 2004, 2801 Seminary LLC transferred one unsold unit to GoCo Investments (GoCo), also owned by Goldman and Collazo.  Goldman testified that the transfers were intended to create additional liquidity that could be used as additional financing to cover costs from existing projects or possibly new projects. Transcript of Record at 65-66, 76, 181, *In Re Goldman*, 13-01431 (2025) (Dkt. 359).  All these transfers to new Goldman/Collazo entities eliminated the ability of each project to repay Dr. Siragusa as the unsold units were now in new entities, which owed no obligations to Dr. Siragusa and the pension plan.

Although past due, the Waveland note owed to Dr. Siragusa and his pension plan was paid in full, and the Seminary notes were partially paid.[3]  Both the Barry and Eddy notes were in default. When pressed to get an update on payment, Collazo stated that there were construction setbacks causing the delay.[4]  Except for 1300 Eddy LLC, each of the projects had transferred all their unsold units to other Goldman/Collazo owned entities.  On March 16, 2005, Art-Man granted a new mortgage on the Waveland and Barry units to Cole Taylor Bank and a subordinated mortgage on the same units to Rainbo.  GoCo also granted a new mortgage on the Seminary unit to Cole Taylor Bank apparently to secure a revolving line of credit.

Between August 2006 and February 2008, many of the previously unsold units were sold (many of them subject to the Cole Taylor Bank mortgage).  The Eddy units, which were not collateral for Cole Taylor Bank, were also sold.  Despite the sales, Dr. Siragusa and his pension

---

[3] No evidence was provided to explain where the funds came from to repay the Waveland and Seminary notes.  It is possible it came from the sale of the condominium units or from other funds available.

[4] Goldman also testified to construction delays. Transcript of Record at 386, *In re Goldman,* 13-01431 (2025) (Dkt. 365).

plan did not receive payment on the overdue notes.  In July 2007, Dr. Siragusa became aware of at least one of these sales as it was brokered by Julie, who informed him of the sale.  At this point, Dr. Siragusa learned that units serving as the basis for repayment on his notes were being sold while he remained unpaid.

In 2005, Collazo and Goldman began work on a large project in Arizona.  Once again, Collazo and Goldman sought unsecured financing from Dr. Siragusa and his pension plan.  This time, other Siragusa family members also loaned money, including Dana, Julie, and Robert Joseph. Dr. Siragusa testified that they met with Collazo and Goldman to discuss the project—Collazo acting as the salesperson and Goldman handling the legal and financial issues.  At this meeting, Dr. Siragusa asked about repayment on the Chicago projects and was told that the Chicago loans would be repaid after the sale of the remaining condo units in Chicago, which were expected to occur within 30 to 60 days.  However, neither Collazo nor Goldman informed any of the Siragusas that all the unsold units had been transferred to other entities that owed no obligation to the Siragusas.

After hearing of the Arizona development and the opportunity to lend unsecured amounts with 20% interest, the Siragusas lent additional amounts to the Goldman/Collazo venture, and on November 22, 2005, CG Development (CGD), another Goldman/Collazo owned LLC, issued a $200,000 note to Dana, Julie, and Robert Joseph.  CGD also issued an $800,000 note to the Siragusa pension plan.  Both notes were set to mature in November 2007.  In addition, Collazo and Goldman pledged their membership shares in 1755 Damen LLC to Dr. Siragusa's pension plan, Dana, Julie, and Robert Joseph. (Dkt. 320, Ex. 47).  Although CGD executed the notes to the Siragusas, which were to be repaid as the Arizona condominiums were sold, CGD never purchased the Arizona development.  Instead, Meridian Corners LLC (Meridian), another Goldman/Collazo-

owned entity, purchased it.  Goldman testified that the mortgage lender required that a Delaware LLC hold title to the property and CGD was an Illinois LLC. Transcript of Record at 104-06, *In re Goldman,* 13-01431 (2025) (Dkt. 359).  Meridian, however, issued no notes to the Siragusas or the pension plan.  Neither Collazo nor Goldman informed the Siragusas that the notes issued by CGD were from an entity that held no interest in the Arizona project.

Once the Arizona project obligations to the Siragusas matured, CGD made no payments. In the summer of 2008, Dana began to pressure Collazo and Goldman, but no payment resulted. As the real estate market suffered during this period, the Arizona property did as well, and the bank lender eventually accepted a deed in lieu of foreclosure for the Arizona project.

Although Dana did not testify in the Goldman trial, she did in the Collazo trial.  She testified that she received a settlement proposal from Goldman and Collazo in January 2009, which provided for payments from the sale of condo units. *In re Collazo*, No. 12 B 44342, 2014 WL 866075, at *9 (Bankr. N.D. Ill. Mar. 5, 2014).  It was at that point she conducted a record search and determined that the borrower-LLCs had long ago transferred their units to entities that owed no obligations to her father and the pension plan and that the original limited liability company obligors had no assets.

**Discussion**

1. **Dischargeability Under Section 523(a)(2)(A)**

Section 523(a)(2)(A) of the Bankruptcy Code "does not discharge an individual debtor from any debt. . . for money . . . to the extent [it was] obtained by . . . false pretenses, a false representation, or actual fraud." 11 U.S.C. §523(a)(2)(A).  The Illinois statute of limitations for all civil actions not otherwise provided for, including fraud claims, is five years. 735 ILCS 5/13-205; *McCarter v. State Farm Mutual Auto. Ins. Co.*, 473 N.E. 2d 1015, 1018 (Ill. App. Ct. 3d 1985).

The statute of limitations applicable to fraud claims begins to run when the claimant discovers or should have discovered that he has been injured by a wrongful act. *Knox College v. Celotex Corp.*, 430 N.E. 2d 976, 979-80 (Ill. 1981); *In re Collazo,* 817 F.3d 1047, 1050 (7th Cir. 2016).

As stipulated to by the parties, Julie told Dr. Siragusa in July 2007 that she sold a condo unit in a project for which Dr. Siragusa had yet to receive any payment—although earlier in 2005, Collazo told Dr. Siragusa, with no correction from Goldman, that payment from the sales of the unsold condo units would be coming in 30 to 60 days.  It was at this point in July 2007 that Dr. Siragusa should have known that he was being misled or lied to by Collazo and Goldman and therefore should have investigated further.  Had he done so, he would have discovered that the Chicago projects that still owed him money had no unsold condo units left because of transfers to other Goldman/Collazo entities.  *In re Collazo*, 817 F.3d at 1051.

Dr. Siragusa and his pension plan's claims against Goldman are time barred as he should have known and investigated back in July 2007, but did not.[5]  That does not apply, however, to Dana and Robert Joseph.  There is no evidence that either knew or were on notice of any transfers of the Chicago condo units before January 2009 when Dana started to investigate the title to the condo units and discovered that they had been transferred to other entities.  The debt owed to Dana ($20,000)[6] became uncollectable because the asset from which she expected to be paid, the units in 1300 Eddy, were no longer assets of 1300 Eddy.  Even though Goldman apparently did not tell Dana anything to induce her to loan additional funds, the silent transfer of the units away from the entity that owed her funds is enough under the Supreme Court's holding in *Husky International*

---

[5] This is in accord with the prior holdings of Judges Wedoff and Alonzo, and the Seventh Circuit in the *Collazo* case, all finding that Dr. Siragusa and his pension plan were time barred as he should have known and investigated back in July 2007 but did not.  Thus, the statute of limitations for fraud claims would have run in July 2012, prior to the filing of the complaint in this case.

[6] *In re Collazo*, No. 12 B 44342, 2014 WL 866075, at *3.

7

*Electronics v. Ritz,* 578 U.S. 355 (2016) for a finding of actual fraud under 11 U.S.C. § 523(a)(2)(A). As the *Husky* court held, under section 523(a)(2)(A) actual fraud can be inferred by action and does not require the spoken or written word. The transfer of the assets (the condominium units) to other related entities, leaving the borrowing-LLCs with nothing was an event of actual fraud and nondischargeable under section 523(a)(2)(A).

### 2. Piercing the Corporate Veil to Find Liability Against Goldman

In his post-trial argument, Dr. Siragusa, his pension plan, Dana, and Robert Joseph argue that the corporate veils of the various LLCs controlled by Goldman and Collazo should be pierced to find liability against Goldman.[7] Illinois courts have developed uniform rules concerning piercing the corporate veil. A corporation, as well as a limited liability company are separate and distinct from its shareholders, directors, and officers. *Peabody-Waterside Dev., LLC v. Islands of Waterside, LLC*, 995 N.E.2d 1021, 1024 (Ill. App. Ct. 5th 2013); *In re Rehab. of Centaur Ins. Co.,* 632 N.E.2d 1015, 1017 (Ill. 1994). "The doctrine of piercing the corporate veil is an equitable remedy; it is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract." *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 776 (Ill. App. Ct. 1st 2005). A claim to pierce the corporate veil must attach itself to a substantive claim. In this case, it must attach to the section 523 claims for fraud. As stated, the Illinois statute of limitations for fraud is five years and therefore, the ability to pierce the corporate veil carries with it a five-year state of limitations. 735 ILCS 5/13-205. "Because a complaint seeking to pierce the corporate veil is not itself a cause of action, the limitations period applicable to such a complaint is governed by the nature of the underlying cause of action alleged in the

---

[7] This argument was not made in the *Collazo* case but was suggested by the Seventh Circuit as an argument that might have been considered. *Siragusa et al. v. Collazo (In re Collazo),* 817 F.3d 1047, 1052 (7th Cir. 2016).

complaint." *Peetoom v. Swanson*, 778 N.E.2d 291, 295 (Ill. App. Ct. 3d 2002).  If Dr. Siragusa's fraud claims are time barred, then his attempt to pierce the corporate veil is also time barred.

Dana and Robert's claims are not time barred because they were brought prior to the running of the statute of limitations, so they may pierce the corporate veil.  However, the court finds that unnecessary as Goldman is liable because he personally benefitted from defrauding Dana and Robert Joseph using the "receipt of benefits" theory.

Although the Seventh Circuit has not had occasion to rule on what is referred to as the "receipt of benefits" theory, other circuits have, holding that a claim may be nondischargeable as to a debtor principal member or holder of equity if the debtor benefitted from the transfer induced by fraudulent activity. *See BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556 (6th Cir. 1992), *Brady v. McAllister (In re Brady),* 101 F.3d 1165 (6th Cir. 1996) (debt may be nondischargeable even if the debtor did not directly receive the funds); *Luce v. First Equip. Leasing Corp. (In re Luce),* 960 F.2d 1277 (5th Cir. 1992); *Ashley v. Church (In re Ashley),* 903 F.2d 599 (9th Cir. 1990) (debt may be nondischargeable where fraudulently inducing investment in company in which debtor was sufficiently related to or profited because he held a financial interest).[8] Additionally, several bankruptcy courts in this district have followed the "receipt of benefits" theory as well.  *See In re Tomlinson,* 1999 WL 294879, at *7 (Bankr. N.D. Ill. 1999) (although debtor did not receive the funds personally, the debtor benefitted because he had a financial interest in the recipient); *In re Collazo*, No. 12 B 44342, 2014 WL 866075; *Gieseking v. Thomas*, 358 B.R. 754, 768 (Bankr. S.D. Ill. 2007) (adopting receipts benefit theory because "whether for money or for some other benefit, people rarely go to the effort of defrauding someone if it does not result in

---

[8] *But see In re M.M. Winkler & Assocs.*, 239 F.3d 746, 749 (5th Cir. 2001) (rejecting receipts benefit theory because section 523 "focuses on the character of the debt, not ... whether the debtor benefitted from the fraud.").

some benefit to them."); *In re Johnson*, 661 B.R. 844, 853 (Bankr. W.D. Wis. 2024) (rejecting debtor's argument that he could not "be liable because [Creditor] loaned the money to [Corporation] and not to him personally.").

This court is persuaded by the reasoning of the three circuits and the bankruptcy courts in this Circuit adopting the "receipt of benefits" theory. Goldman held a 50% interest in the LLCs alongside Collazo. No evidence was presented that Collazo or Goldman received any money personally from the Siragusas, but their LLCs did and "clearly benefitted from the loans." *In re Collazo*, No. 12 B 44342, 2014 WL 866075, at *7. Goldman derived a personal benefit from the loans, and he is not immune from liability. His removal of the unsold units from each project and the complete failure to inform the Siragusas of the removal as well as the fact that CGD held no interest in the Arizona project allowed him to orchestrate the fraud on the Siragusas. The loans personally benefitted him. It was his conduct and lack of disclosure that induced the Siragusas to loan the funds for which they had no hope of recovery. It was Goldman's actions manipulating the movement of the unsold units that harmed the plaintiffs.

<u>**Conclusion**</u>

Accordingly, judgment should be entered against Goldman and in favor of Robert Joseph Siragusa in an amount equal to $150,000 plus 5% *per annum* simple interest on $150,000, which should run from November of 2005 to the time that judgment is entered, with punitive damages of $75,000 added to that total amount. Judgment should also be entered against Goldman and in favor of Dana Siragusa in an amount equal to $50,000 plus 5% *per annum* simple interest on $50,000, which should run from November of 2005 to the time that judgment is entered, with punitive damages of $25,000 added to that total amount. However, to the extent that Robert Joseph

and Dana received payment of the judgment that was entered (and settled) against Collazo, that amount should be subtracted from any of the judgment award against Goldman.

A status hearing will be held on April 22, 2026.  Seven days prior to that hearing, Robert Joseph and Dana should file with the court and serve on counsel for Goldman an accounting of all amounts received from Collazo because of the judgement previously entered and a calculation of the appropriate interest.

Dated:  March 20, 2026

_____
Honorable Deborah L. Thorne
United States Bankruptcy Judge